CHARLES M. JEFFERDS, plaintiff in error, *v.* THE PEOPLE, defendants in error.

Charge of the recorder in a case of murder, tried under the act of 1860, discriminating between and defining murder in the first degree and murder in the second degree, and commenting upon the rules of evidence applicable to each.

To justify a conviction on circumstantial evidence, the facts and circumstances must be such as to exclude every other hypothesis than that of the guilt of the accused.

Discussion, by the recorder, of the evidence bearing upon the question of motive for the commission of the act.

The rules of law which render the confessions of a prisoner inadmissible as evidence when obtained under promises of favor, stated and explained by the recorder.

Sentence of the prisoner, pronounced by the recorder, on conviction of murder in the first degree.

On a trial for murder, evidence of threats made by the prisoner two years before the alleged murder, was admitted. On review, it was held that such evidence was admissible, and that lapse of time was no objection to its competency; and it was also held that evidence afterwards given on the trial, showing that, after the threats had been made, friendly feelings were restored between the parties, did not render the previous evidence of threats incompetent, but made only an additional fact for the consideration of the jury in determining the weight to be given to them.

It is not a good reason for striking out evidence of the confessions made by a prisoner, that it appears such confessions were made while the prisoner was intoxicated, and that such confessions had been obtained by a detective police officer, who sought, by furnishing liquor, to ingratiate himself into the

Jefferds *v.* The People.

confidence of the prisoner. It belongs to a jury, in such a case, to say how far the prisoner was affected by the influence of liquor when he made the confessions, and what weight they are entitled to.

Such confessions, if made without any promise or inducement, though obtained by deception, the prisoner being misled as to the true object and character of the officer, are to be considered as voluntary.

A request made by counsel to the court, to consider him as excepting to each question to be asked a witness, is too general to be available. Each exception should be distinctly taken, and separately incorporated in the bill of exceptions.

The mother of the prisoner having been called, in his behalf, as a witness, and having testified, on her direct examination, that she was the widow of W., who was killed at the same time and by the same person as M., for whose murder the prisoner was on trial, held, that it was not erroneous to permit the prosecution to prove, on the cross-examination of the witness, facts tending to show a relation to W., different from that sworn to by the witness.

For the purpose of proving that she was not the widow of W., as stated by her on her direct examination, it was held proper to ask her, on the cross-examination, if she had ever been married to H. M., who was stated by her to be still living; and such marriage having been denied by her, held, also, that it was competent to ask her, on the cross-examination, whether she had ever made an affidavit stating that she was the wife of H. M., it appearing that such affidavit had been lost; and after she had stated that she had no recollection of having made such an affidavit, it was held to be competent to prove the making, by her, of such an affidavit by the magistrate before whom it was taken.

*Held,* also, that for the purpose of disproving her relation to W., claimed by the witness, and, also, of discrediting her, it was competent for the prosecution to introduce, in evidence, a deed executed by H. M., and by the witness as his wife.

It is not error in a judge, in charging a jury, to comment on the facts, or even to state his own theory in regard to them.

Where a capital case has been tried at the General Sessions of New York, the Supreme Court has power, on writ of error, under the act of 1855 (*chap.* 337, § 3), to order a new trial, when it shall be satisfied the verdict was against law, or against the weight of evidence, or that justice requires a new trial, "whether any exception shall have been taken, or not, in the court below."

THE prisoner was indicted for the murder of John W. Matthews, alleged to have been committed on the 30th June, 1860, by shooting with a pistol, and pleaded not guilty.

The issue was tried before the Court of General Sessions, in and for the county of New York, in December, 1861, JOHN T. HOFFMAN, recorder, presiding.

The case was conducted, on the part of the prosecution, by NELSON J. WATERBURY (district attorney), and, on the part of the defense, by ROBERT D. HOLMES and JAMES T. BRADY.

The facts claimed on the part of the prosecution, and sought to be proved, will best appear from the opening of the case by the district attorney, which was as follows:

MR. WATERBURY: " May it please the court — gentlemen of the jury. The prisoner at the bar, Charles M. Jefferds, is indicted for the murder of John W. Matthews, who was shot on the 30th day of June, 1860. On that evening, a gentleman by the name of John Walton, the stepfather of the prisoner, was killed on the corner of Eighteenth street and the Third · avenue. He was passing up on the north side of Eighteenth street, and, as he approached the corner of Third avenue, a man was seen by several witnesses — two at least — lurking behind a tree that stood there; and that man, the prosecution claim, and we think we shall be able to satisfy you, was the prisoner at the bar. Mr. Walton was accustomed to visit that neighborhood in the evening of every Thursday and Saturday. He had a distillery, or refinery, or some establishment of that kind, in Eighteenth street, near the First avenue; and it was his practice to go there on those evenings, and to leave in company with a young man by the name of Pascal, who was with him on the evening in question. As they neared the corner of the Third avenue, the prisoner, who was lurking, as I have stated, behind a tree, stepped out, as Mr. Walton passed, and shot him, by putting a pistol to the back of his head, the ball ploughing its way upwards through his brain, and inflicting a wound from which he died, very shortly. The prisoner then ran down Third avenue to Seventeenth street, through Seventeenth street to Irving place, and then turned into Irving place. As he was running, the deceased man, John W. Matthews, a public spirited citizen, hearing the cry of murder, and impelled by a noble spirit to do what he could towards the arrest of a man who had committed so atrocious a crime, joined in the pursuit. Being a vigorous and alert man, he gained rapidly upon the prisoner, so that when

the latter had passed a little way down Irving place, some thirty or forty feet — I think it was — below Seventeenth street, he suddenly turned and fired at Matthews, who was then within six feet of him, killing his second victim almost instantly. From thence the prisoner fled into Sixteenth street, towards the Fourth avenue, suddenly sprang over an area fence and hid himself under a stoop, until pursuit had ceased, when he came out, and escaped by passing to the Fourth avenue, jumping, at Seventeenth street, on a car going up, and, at Nineteenth street, changing to a car going down. In this way he probably proceeded to the foot of the Park, and from there to the south ferry, and crossed over in a ferry-boat to the Union Hotel, No. 1, Atlantic street, Brooklyn, at which he was then stopping. The question in regard to the identity of the prisoner is one of great importance. You will understand that, in asking questions relative to identity, the prosecution are confined to general questions, and the answers of the witness to such questions. We cannot probe him by a cross-examination, and develop the precise extent of his opinion in respect to the identity of the person, and the degree of confidence which he has in it. That is the especial right and privilege of the defense, and it will be in their power, by a thorough cross-examination of each of these witnesses, to show to you exactly how strong or how firm the witness is, in whatever opinion he may express in regard to the identity of the prisoner, as the person seen by him that evening.

There will also be corroborative evidence of statements made by the prisoner to a gentleman from Long Island by the name of Betts, with whom he had been boarding; to another gentleman, to whom he was introduced on the following Sunday — the day next after the murder; and to the people of the house at which he was stopping, I believe, gentlemen, the effect of this evidence will be such as to leave no doubt in your mind of the guilt of the prisoner.

But, in addition, you will have explicit evidence of confessions by the prisoner, that he killed Mr. Walton, the first of the two men who were shot that night; and here I may also

state to you, that it will very likely appear that those confessions were made while the prisoner was somewhat under the influence of liquor. There is an old saying, that " when wine is in, wit is out." Liquor often has an effect to stimulate the mind and loosen the tongue, and when men are very slightly affected by drink, they are apt to make statements which they would withhold in their more sober moments.

This, gentlemen, is a very brief statement of the testimony which will be submitted to you in this case, bearing upon the question of the guilt or innocence of the prisoner."

It appeared on the trial, that the prisoner had already been tried for the murder of Walton, and acquitted.

Many witnesses were examined on the part of the prosecution, who proved facts and admissions tending to establish the guilt of the prisoner.

After the evidence was closed on the part of the prosecution, the counsel for the prisoner called, as a witness, Mrs. Ellen M. Walton, the mother of the prisoner. She testified, among other things, that she was the widow of John Walton, and then proceeded to give other material testimony in the case.

On her cross-examination, she testified that she had had three husbands, viz., Charles Jefferds, Francis S. K. Russell and John Walton, and no others; that Charles Jefferds died in 1853; that she married Mr. Russell in 1851, and supposed at that time that Mr. Jefferds was dead; that she had not then lived with Mr. Jefferds for seven years; that she lived with Mr. Russell about two years, and left him because he was intemperate, and that he was not then living; that she married Mr. Walton on 17th October, 1858; that her marriage with Russell was annulled, on the ground that Jefferds was alive; that she lived with Hamilton Morrison as his wife, but was never married to him; that she never went before an officer and swore that she was Morrison's wife; that she had no recollection of ever having made such an affidavit; that Hamilton Morrison is now living, and that she had written to him three or four letters since the death of Mr. Walton.

*Samuel W. D. Moore,* called by the prosecution, proved that

Jefferds *v.* The People.

he was formerly a police justice in the city of Rochester, and knew Hamilton Morrison; that about ten years ago, Mrs. Walton appeared before him and made an affidavit that she was the wife of Hamilton Morrison; that he had made a thorough search for the paper, and could not find it.

All this evidence was objected to on the part of the prisoner, and exceptions taken to its admission.

The prosecution also put in evidence a deed executed by Hamilton Morrison and Helen M. (Mrs. Walton), as his wife, and an exception was taken by the prisoner's counsel to its admission in evidence.

The other evidence on which questions of law were raised, will sufficiently appear in the opinion of the court.

After the close of the evidence, the prisoner's counsel moved to strike out of the case all the testimony as to the alleged confessions or declarations of the prisoner, while under the influence of intoxicating drinks, on various grounds then stated at length. It was then consented that the motion should be disposed of by the court at some subsequent time, or on its charge to the jury.

The counsel for the defense and the district attorney having addressed the jury on the facts, the recorder proceeded to charge the jury as follows:

GENTLEMEN OF THE JURY: The trial of Charles M. Jefferds — one of the most remarkable in the annals of criminal jurisprudence — is drawing to a close. For nearly five days you have listened, with the greatest patience and care, to the details of the evidence for and against him. Counsel, than whom none in the State is more distinguished and able, has addressed you to-day, with great power and eloquence, in his behalf; and a prosecuting officer, than whom I have never known one more conscientious and faithful, has presented to you, in all its force, the array of facts which bear against him. It remains for me, now, in the solemn discharge of my duty, briefly to instruct you upon the law, and to review the facts of this case, and, when I have done that, the responsibility rests with you. It is for you then, if you believe the prisoner to be guilty, to

pronounce him so, and by your verdict to consign him to that punishment which, if he is guilty, he deserves; or, if you believe him not guilty, to say so, and forever discharge him from accountability to any earthly tribunal for the crime with which he is charged. The prisoner, gentlemen, stands here indicted for the murder of John W. Matthews, on the 30th of June, 1860. The facts connected with that murder have made it necessary to investigate another murder, and we have had to inquire into the circumstances attending the death both of John W. Matthews and John Walton; the motives which bear upon the question of the killing of Walton, and everything connected with the antecedents of the persons in any way associated or connected with him. I shall, for the purposes of my charge, assume — although it is a question of fact for you to determine, and I do not desire, and shall not attempt, to take that question away from you — that the man who shot John W. Matthews shot John Walton. You may not think so, gentlemen. If so, if you differ from me, you will take the responsibility of doing so. But, upon the evidence as I understand it, I shall assume that fact.

The first question to be considered, as matter of law, is, whether the man who killed John W. Matthews is guilty of murder in the first degree. I understood it to be admitted upon the trial, and I so noted in my minutes, that John W. Matthews came to his death by the bullet shot from the pistol in Irving Place, on the night of the 30th of June, and that whoever killed him was guilty of murder in the first degree. There has been, however, some discussion of that question by counsel for the defense. I therefore feel bound to instruct you upon that point precisely as if that admission had not been made, and to state to you what constitutes murder in the first degree; and it will be for you to determine whether the prisoner is guilty of that offense. By the act of 1860, April 14, the legislature subdivided murder into two degrees, and declared that "all murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate, and premeditated killing, or which shall be commit-

ted in the perpetration, or the attempt to perpetrate, any arson, rape, robbery or burglary, or in any attempt to escape from imprisonment, shall be deemed murder of the first degree, and all other kinds of murder shall be deemed murder of the second degree; and the jury before whom any person, indicted for murder in either degree, shall be tried, shall, if they find such person guilty thereof, find in their verdict whether it be in the first or second degree."

It will be conceded by everybody that whoever shot John Walton was guilty of murder in the first degree, because there was clearly manifest the lying in wait which is spoken of in the statute. Whether the killing of John W. Matthews was murder in the first degree, so far as it turns upon the evidence in this case, will depend upon whether you find that the killing was willful, deliberate, and premeditated. Now, in regard to that, what I have to say is this: that if a man, being pursued by another, turns upon him, and willfully, deliberately, and premeditatedly kills him, he is guilty of murder in the first degree; and it is a matter of no consequence whether he deliberates one minute or one hour, whether he premeditates one minute or one hour, whether he forms that design one minute or one hour before. If there is willful, deliberate and premeditated killing, it comes within the definition of the statute, and is murder in the first degree. If, on the other hand, there is not the design to kill, but willful, deliberate, and premeditated shooting, with the intention to do some bodily harm, and death results, it is murder in the second degree. But the law presumes that every man intends the natural consequence of his acts. As for instance, if a man places a pistol at the breast of another, at his heart, or any other vital part, and fires, the law presumes he means to kill him, and it is for him to rebut the presumption. Under this statement of the law, in case you find that the prisoner was the person who fired the pistol, it is for you to say whether he is guilty of murder in the first or second degree.

The evidence in this case may be divided, in plain language, into that which is known as circumstantial and that which is

known as positive; and the latter includes proof of the declarations of parties, which are called "confessions" and "admissions." In regard to circumstantial evidence, the rule is, that, to justify a verdict of guilty, the facts and circumstances must be such as to exclude every other hypothesis than that of the guilt of the accused. If, upon the evidence, you have any reasonable doubt as to his guilt, you are to give him the benefit of that doubt, and acquit him. I say, reasonable doubt: I use that expression; and it commends itself to your common sense. You will at once distinguish it from any fanciful theory or speculative doubt, which can have no warrant in reason or foundation in fact. The prisoner is always entitled to every reasonable doubt that exists in the minds of the jury. Circumstantial evidence, to repeat, in order to be sufficient to convict a man, must be so perfect in its chain as to exclude every other hypothesis than that of guilt. Now, gentlemen, you all know that circumstances, to use a common, homely phrase, may lie. So may witnesses upon the stand; but, because circumstances may deceive, because there may, at times, be such a chain of circumstances as to point out, with apparent certainty, the guilt of a man, and yet it be found, thereafter, that he was innocent, it does not therefore follow that circumstantial evidence is to be rejected. Because witnesses upon the stand may commit perjury, and a man, through the means of their perjury, be consigned to a felon's cell, and his innocence be afterward established, it does not follow that the testimony of witnesses must be rejected. Men have been known to confess, to make admissions of crime which it afterward turned out that they had never committed; and yet it does not follow that confessions should be rejected and go for nothing. The true rule is, that evidence, no matter what its character, whether circumstantial, whether positive or direct, or whether proof of the statements of a party, commonly known as confessions — the true rule is, that all evidence is to be carefully scrutinized by juries, as intelligent men, and if, upon the evidence, no matter what its character may be, their judgment is convinced of the guilt of the accused, then they are to find him guilty ·

Jefferds *v.* The People.

if not, they are to acquit him; and because the books contain cases in which innocent men have been convicted upon evidence which seemed to be conclusive, juries are not to allow a man to go unpunished if they are convinced that he is guilty. Upon the subject of confessions, I shall have more to say hereafter.

I do not propose to review the facts of this case at any length. It would seem to be an unwarrantable consumption of your time. Counsel on each side have discussed them fairly; and believing, as I do, that there has been no misrepresentation of the evidence, I do not consider it to be my duty to recite them at any length. I shall only hastily and briefly call your attention to the main facts, in the order in which they have impressed my mind. It is not possible that I should have presided during this trial without forming an opinion in this case. No man could do that, yet I have no right to indicate my opinion to you. I trust I shall not. If I do, you are to disregard it, because in the consideration of the question, whether this man is guilty or innocent, the law has made you the judges. You are to determine that matter; it is your responsibility; and you are not to be governed by any expression which may inadvertently escape me, or by any opinion which may be inferred from the course of my remarks. This murder, this killing (perhaps it would be more proper for me to use that word), occurred on the 30th of June, 1860. It was near midnight, when, on the upper corner of Eighteenth street and Third avenue, where there was a drug store, not yet closed (you remember that one of the witnesses speaks of a man coming out of the drug store), a man stood partially concealed behind a tree, and two men, John Walton and Richard Pascal, walked along on the north side of that street, from the Second avenue, and came to where he was. He stepped out in the bright moonlight, in the public street, close by the open drug store, in sight of a man who was standing on the opposite corner, and placed a pistol to the head of John Walton, and shot him, and Walton died.

Now, gentlemen, the commission of this murder may seem

to you to be the act of a cool, calculating, cold-blooded, scheming assassin, or it may seem to you to be the act of a desperate, reckless man, who was willing to take the chances of escape, even under circumstances which seemed to render his detection not only possible, but probable; not only probable, but certain. I do not know how the facts may impress you. Look at them in all their aspects, and determine for yourselves which would have been most likely to have done the deed — a calculating, scheming, experienced assassin, or a bold, reckless daring man — because that decision may aid you in coming to a conclusion in this case. The facts may indicate to you, and probably do — there seems to be no dispute about it — that whoever stood upon the corner, to fire the shot which killed John Walton, knew his habits. He seems to have been in the habit of spending two nights in the week at his place of business in Eighteenth street — on Thursday night leaving to go home at an early hour, between nine and ten o'clock, and on Saturday night between eleven and twelve. The murderer was waiting for him on that Saturday night, between eleven and twelve o'clock. It is probable, therefore, that he knew his habits, or had been watching him, and knew that he would come that way.

. The murder having been committed by somebody, the man who committed it ran down the Third avenue, along the middle of the street, to Seventeenth street, through Seventeenth street to Irving Place, and when in Irving Place he turned upon one of his pursuers, fired again, and the second man fell, exclaiming, " I am shot," and died. I do not suppose, gentlemen, that once in a thousand times two shots could have been fired in such quick succession, under such circumstances, and have resulted in the death of two men, and the man who fired them have escaped immediate detection. The murderer made his way through Irving Place to Sixteenth street, and was seen going towards the Fourth avenue. A man was seen to jump over the area railing at No 37 Sixteenth street, and go under the steps; that is what Mary Ann Davis says. Now, whether that man was the one who shot these two men, or whether the

Jefferds *v.* The People.

latter kept his way through the street, and was not the man whom Mary Ann Davis says she saw, is a question for you to determine. I do not know what conclusion you may come to in regard to that. If the murderer went under the steps of No. 37, from which it is said the cars of the Fourth avenue could be seen, and Mary Ann Davis says she heard the cars coming about that time, he afterwards came out and walked briskly towards the Fourth avenue, and that was the last that was seen of him, by anybody who saw either the killing or the pursuit, and the last that was seen of him by anybody that night, so far as we have any positive testimony in the case.

Such, gentlemen, are the circumstances of the murder and of the escape, and we now come to the question whether there is anything in the facts of this case to indicate the man who committed the act. As to John Walton, we know that that night he was at his place of business in Eighteenth street. We have some knowledge — I cannot say it was directly proved, although Mrs. Walton said something about it — that he had been to Washington, from which place he had returned on the Thursday night previous; still, there is no positive testimony on that point. We know, also, from the testimony of an employee at that place in Eighteenth street, that that evening he had been sitting, just before he left the place, upon a barrel, talking and laughing with one of the men; and we know that he started from there in the company of a man who was in the habit of being with him whenever he was out at night. Now, as to the prisoner's whereabouts previous to and at the time of this occurrence, because we are to see whether there is anything which connects the prisoner with this matter, with that unerring certainty which is necessary to fix this charge upon him. He had been at Cutchogue from the 1st to the 23d of June, and on that day, Saturday, he left, saying that he was going to Delaware, and went to the Union Hotel in Brooklyn. We know nothing more of him, except that on Monday he returned to Cutchogue, saying to the landlord of the Union Hotel in Brooklyn, that he would be back on Thursday. On Thursday he returned to the Union Hotel.

On Saturday, the 30th of June, some time in the afternoon, he went to New York. He is seen in New York that evening, between eight and nine o'clock, going up Broadway. O'Brien says he met him, and he, O'Brien, was going down. There is no other direct testimony as to where the prisoner was that night, except that he returned to Brooklyn.

The prisoner is to be convicted only in case the prosecution make out a case against him. He is not bound to furnish any evidence, and his counsel is right in saying that he is not to be convicted on account of his failure to produce testimony as to where he was that night. The only testimony that he has presented on that point, is that of the witness, O'Brien, that he met him going up Broadway in the evening. The next that we know of him with certainty is, that some time between fifteen and thirty minutes past twelve at night, he came to the door of the Union Hotel, Brooklyn, and, as Mrs. Costigan says, rapped suddenly, with a loud knock, and she let him in. The time at which he arrived is fixed by her and by her son at between fifteen minutes past twelve and half-past twelve.

Now, gentlemen, the first question, it strikes me, on this brief review of the evidence, for you to determine in your minds, is — for it is, after all, the main question in this case, above and beyond anything else in it — was it possible for the prisoner to have committed the murder at the time and place mentioned, and have been in Brooklyn at the time at which the witnesses say he arrived there; because we have the two facts to start with, undisputed, that he was in New York, going up Broadway, early in the evening, between 8 and 9 o'clock, and that he was again in Brooklyn between a quarter and half-past 12. If the jury find that it was possible, then we will see what facts there are to indicate that he was the murderer. Now, as to the time of the murder: Richard H. Pascal left Walton's store, he says, about 25 minutes past 11; the store was near that corner, not far down the street. Samuel Lee says what he saw of the occurrence was between 11 and 12; he fixes the time indefinitely. Henry Hessel fixes the

Jefferds *v.* The People.

time at 11.30. Wm. A. Bayley says that he looked at his watch just an instant before he heard the shot, in Irving Place, and it was 20 minutes past 11. Joseph H. Foster says that he turned the corner of Irving Place at 11.20, heard the pistol report, and felt conscious of a person passing him at or near the northwest corner of Sixteenth street. Henry J. Morgan fixes the time between 11 and 11.30; he says a man ran into Sixteenth street. Thomas M. Lewis saw the man shot, and fixes the time about 11.30. John J. Bradley heard the shot at about 11.20. Mary Ann Davis is indefinite about it, and says it was between 11 and 12. Francis says that at 11.33 a man jumped on to his car. Gilliland fixes it at between 11.15 and 11.25. Frederick Curtis fixes the time at about 11.20 — so that somewhere, gentlemen, between 11.20 and 11.33, being the most remote times fixed by the winesses, this murder was committed. The question is, therefore, whether the murderer, having committed this murder at that time and at that place, could have reached Brooklyn at the time testi-fied to? Because, if you find it to be an utter impossibility for this prisoner to have been at the two places and at the time specified, the confessions become of little consequence; whereas, on the other hand, if you find that it was possible for him to have been at the two places at those times, then the confessions become very material. I do not consider it, gentlemen, as very important, in my view of the case, how long the murderer staid under the stoop of No. 37 Sixteenth street, or whether, indeed, he was the man who jumped into that area, or how long he may have been running from one point to another. If the murder was committed at any time between 11.20 and 11.35, in Irving Place, and a man was running at full speed, it would seem by this evidence, as I read it, that he could very easily have caught the car any-where in the Fourth avenue, which car, you will recollect, appears, by the testimony of the conductor, to have left the upper depot at Twenty-sixth street, at half-past 11. If, by either running directly from the scene of the murder, or stop-ping under the stoop until he heard the car approaching, he

could have reached the Fourth avenue in time to take the down-car, or else the car going up, as far as Nineteenth street, and then the down-car —if he could do either, then it appears, by the time-table of the railroad, he could have reached the Astor House at two minutes before 12. The conductor, Francis, says that the car which he had charge of came along by Fifteenth street at 11.33, when a report of a pistol was heard. Whether that was the shot which produced the death of Matthews, or some other shot, is for you to determine; it is not for me to say. At any rate, it started the horses. At Seventeenth street, while he was sitting on the platform of his car, a man, running from the direction of the corner of Sixteenth street and Fourth avenue, jumped on the rear platform of the car, took a seat inside, and disappeared from the car before it got to Nineteenth street, without his departure being noticed. At Nineteenth street the down car was met. If the man who committed this murder got on to the up car, and then took the down car, or if he got on to the down car, without having entered the up car at all, he should have reached the Astor House at two minutes before 12. The ferry boats left at a quarter past 12 — seventeen minutes between the arrival of the car at the Astor House and the departure of the boat at the ferry. Could he have gone the distance from the Astor House to the ferry, on foot, taken the ferry boat, and arrived in Brooklyn at the time fixed? Upon that question, gentlemen, you have the evidence of three officers, and they will give you this report. Officer Glass made the journey on Tuesday evening. He started from the corner of Eighteenth street and Third avenue at 22 minutes past 11, and landed in Brooklyn at 22 minutes past 12. He stated he had to wait several minutes at the ferry. Officer Foshay made a similar journey on the same evening, starting at 25 minutes past 11, arriving in Brooklyn at 23 minutes past 12. Officer Quackenbush made the journey from the corner of Eighteenth street and third avenue, leaving at 11.20; he got to Nineteenth street and Fourth avenue at 11.24, waited eight minutes for a car, got to the lower end of the Park at 11.55, went

Jefferds *v.* The People.

quickly to the south ferry, arriving there at three minutes past 12. The boat left at 14 minutes past 12, and touched the Brooklyn side at 12.21. His watch evidently varied from the time of the boat, because he puts the hour at which the boat left this side at 12.14. Now, gentlemen, it is for you to determine, as matter of fact, upon a review of the evidence, whether it was possible or not for the prisoner to have performed this journey. You have heard the comments of the counsel for the defense and for the prosecution; both sides have been fairly presented to you. I do not say whether it was possible or whether it was not. If you find that it was possible, then the next question is, whether the facts in the case indicate that the prisoner is the man who committed the murder, and whether they indicate it to a certainty, or whether they indicate merely a probability.

*Mr. Brady:* Your honor will pardon me for suggesting that, in this connection, they are to consider the testimony of Dr. Jones, as to the physical condition of the prisoner.

*Recorder:* In regard to the testimony of Dr. Jones, and I am very much obliged to the counsel for calling my attention to it, who testified as to the physical condition of the prisoner; he stated that in the condition in which he was on Monday night, the murder having been committed on Saturday, it would have been exceedingly painful, if not impossible, for him to have made that journey. In answer to a question by the foreman of the jury, as to whether a journey, made under the circumstances described, would not have been calculated to have aggravated his condition from what it was before, he answered, "yes." That, gentlemen, as you will perceive, leaves the question open as to whether the prisoner was in the condition on Saturday in which he was described to have been in on Monday, or whether the aggravated condition of his complaint was the result of something occurring between Saturday and Monday. You have the testimony of the doctor upon that subject. If you believe that, in consequence of his physical condition, he could not have made that journey, or that his condition would have been effective to have prevented

him, it is a circumstance in his favor, to which you will give full consideration. If, on the other hand, you think it possible that this aggravated state of the disease might have been caused by the violent exercise, you will attach less weight to the testimony of Dr. Jones. If, in view of all these facts, you think it was possible for him to have made that journey, then is it probable, or is it certain, that he is the man who shot the deceased? Now, there is some evidence of identity, slight, indeed, but yet evidence upon that subject. Pascal says that, at the time, he thought it was Charles Jefferds. I desire to be spared any comment at all upon the testimony of Pascal. You have heard his testimony. You have heard what the prosecuting attorney and the counsel for the prisoner have said, and you know how well they agree in their estimate of Pascal's actual knowledge in this matter. There is no necessity for me to say anything further upon this subject, except to call your attention to the fact that Pascal said he knew Charles Jefferds well, and, at the time, he thought the man was Jefferds. Hessel, the soldier, said "that the man looked like Jefferds." Mary Ann Davis, who saw his side face when he went in, and his full face when he came out from under the stoop, said "the man looked like Jefferds." Francis, the conductor of the car, said "the man who got into his car looked as much like him as two men can look alike." Curtis said nothing at all upon the question of identity; he said something in regard to the clothing. Now, gentlemen, in regard to evidence as to identity, there is no doubt about the fact that there have been terrible mistakes made at times by witnesses who have undertaken to testify upon that subject. The books abound in cases of this kind, and there are numerous instances in which men have been just as positive in their testimony as to identity as about anything else, and have been mistaken. It does not always follow, because a man says, "that was the man," that his testimony is entitled to any more credit than that of another who says, "I verily think that was the man." It may be a different expression to convey the idea. Yet, any testimony at all upon the question of identity, coming from

Jefferds *v.* The People.

people who have merely a glimpse of a man running in the moonlight, under the exciting circumstances attending such a chase, is to be looked at cautiously and subjected to the most careful scrutiny. The only man, except Pascal, and except, perhaps, Hessel, who stood on the other corner, who could have had any near view of the murderer's face, was the conductor of the car, and he said "that he looked as much like Jefferds as two men can look alike."

If there were no evidence in this case except this evidence of identity, I do not suppose that any person would ask for the conviction of the prisoner, because, when the opportunity was so slight as was that furnished to these witnesses to see the murderer, there would be so much room for mistake that jurors would, of course, give the prisoner the benefit of the doubt; but if the other facts and circumstances in the case indicate that the prisoner is guilty, then this evidence of identity, weak as it may be, becomes a necessary and important element of the case, and you will give it that attention which you think it deserves. There is other testimony in regard to the man who committed the murder, and that is in respect to his clothing. All the witnesses but one say that he had on light clothing. One witness, who was in the second story of his house (whose name I do not now recollect), says if his clothing had been white he would have noticed it; in other words, that it was not light enough to attract his attention; all the other witnesses concur in saying that the murderer had on some sort of a light coat. Counsel for the defense argue that Jefferds was seen going up Broadway in dark clothes; that he arrived in Brooklyn in dark clothes. They are correct; and if Jefferds committed this murder, and had on light clothes, he must have made the change before he arrived in Brooklyn, and where he made it, if he made it all, and where he could have made it, are questions open for discussion and consideration. Of course you will give the prisoner the benefit of any doubt to which you think he may be entitled in the consideration of the case. If these witnesses may be mistaken about the color of a coat, mistaking the glare of the moonlight

upon it for color, then that testimony will have less weight; if they are accurate in that respect, and you are satisfied of the fact, then of course there must have been a change somewhere to enable the prisoner to have arrived at Brooklyn in the clothing he is said to have had on when he reached the hotel.

These, gentlemen, are the facts, briefly stated, bearing upon the locality, the persons, the time, the circumstances immediately attending the murder, the possibility of its having been committed by a man who arrived in Brooklyn between fifteen and thirty minutes past twelve, the evidence touching upon identity and upon the clothing and other matters relative to that branch of the subject; but remember that we have not come at all to the consideration of admissions or confessions. Now, if you believe it possible or probable, upon that statement of facts, that Jefferds might have committed this murder, the next question that you will necessarily ask yourselves will be, what motive had he to commit the offense? It is very evident that whoever killed Walton, did not kill him for the sake of robbing him; that was not the motive. It is very evident that whoever killed Matthews, killed him to escape arrest, to evade pursuit; but in looking for the motive for killing Matthews, you must, of course, look back to see the motive for killing Walton. It was not robbery. Was it revenge, either of the murderer's own wrongs, or the wrongs of somebody else? That would seem to be the motive, from the character of the deed, unless it was a murder perpetrated by some one hired to do it. It is said that in all great cities there are men who can be hired to do anything, even to the taking of life; but then these men are not apt to do the deed under such circumstances. If not done by a hired assassin, then the probability is that the motive, in this case, was revenge. Had the prisoner any such motive?

Upon the question of motive, you have several matters testified to on the part of the prosecution. In the first place, there are certain threats which he made at a remote period. Now, the law is well settled that you may give evidence of

any threats made by the accused in reference to the deceased; they bear upon the question of motive; but they may be so remote that they would have no force. If there was nothing in this case, except that as long ago as February, 1859, the prisoner threatened to shoot John Walton, and it appeared that thereafter they lived in peace, the jury would attach very little importance to that threat; but if it should appear that, as early as that period, upon provocation, such as the ill treatment of his mother, or the ill treatment of himself, he threatened to carry out a deadly purpose, namely, the taking of the life of the man who injured him or his mother, and it should also appear upon the evidence, that subsequently the causes which had aroused that state of feeling, increased in force rather than diminished, then the remote threats might have a double force and effect, because the jury might, and probably would reason, "that if a man, when he found his mother was injured once, threatened to kill the man who injured her, he would be very likely, if he found the injuries were committed again, increased and doubled, to make the same threats, and, perhaps, carry them into execution." That would be the ordinary course of reasoning in my mind; I do not know how it would be in yours. It appears by the testimony in this case, that at the time those threats were made, there was some trouble between Mr. Walton and his wife. That trouble went so far that Walton had Jefferds arrested. Jefferds made threats in the presence of Dr. Gunn, and in the presence of Mary Walton; but that difficulty passed over, and Jefferds afterward lived in the same house with his stepfather, took the young daughter of Mr. Walton to the theater, and was sent by him to Europe. It seems that the difficulties between Mr. and Mrs. Walton were renewed after that; and in the latter part of April, if I recollect the evidence rightly, Mr. Walton went away from the house in which they were living, and in May, as Mrs. Walton says, put her to board somewhere else. She was to have gone on the 1st of May, but did not go until the 8th of May, in consequence of the sickness of one of her children. Then, it appears in evidence that, about this

time, a suit was being prosecuted against her by Mr. Walton for divorce, and the difficulties which had existed before, had ended in an open rupture. They had separated; hostile feelings existed between Mr. and Mrs. Walton; the whole matter was published in the papers, conspicuously. Mrs. Walton attempted to take some things out of the house; she was arrested for it, and she said, at the time, that Mr. Walton was at the bottom of it. So you can perceive that the ill feeling which then existed between Mr. and Mrs. Walton was greatly aggravated beyond that which existed when the threats were made in 1859. I do not propose to consider the matter at any length. It is before you. You will consider, to such extent as you may deem proper, the question as to whether or not there was a promise by Mrs. Walton to the prisoner to give him two thousand dollars to commit the murder. If you should find that there was, there would be an additional fact to show a motive for the murder. Now, if you find it possible for him to have committed the murder, and you find the motive, then, what facts, if any, point to the prisoner, and, if any, are those facts conclusive? The defendant, the prisoner at the bar, had been living at Cutchogue from the 1st of June. The separation between his mother and Mr. Walton had taken place in the latter part of April. His mother said she did not know whether she saw him (Jefferds) two weeks or one week before the murder. It is very evident, from the testimony in the case, that she could not have seen him two weeks before the murder, but on the Sunday preceding the murder, he was in the city, and she could have seen him, and that must have been the time she saw him. He had not been up from Cutchogue but once between the 1st of June and the time he came up on Thursday ; that once was when he came up on the Saturday previous, saying that he was going to make a journey to Delaware to spend the fourth. He went back on the Monday following, telling Mr. Devaucene that he would return on Thursday. On Thursday he started to come back again, telling Mr. Betts that he would not stay down there, because there would be no one there, and he did not want to be alone ;

but he had made a previous appointment with the landlord in Brooklyn to be back on Thursday, and had taken his room for that day. He came back, therefore, on Thursday, and, as we have seen, remained there and in New York until the night of the murder. Now, gentlemen, another fact of the prosecution—for they claim a verdict on the facts alone—is in regard to the pistol. You will recollect that I have called attention to the fact that the separation between Mr. and Mrs. Walton occurred about the latter part of April, and that Mrs. Walton was sent away to board between the 1st and the 8th of May. On the 30th of April, Jefferds bought a pistol, precisely like the pistol found in the yard corner of Fourth avenue and Sixteenth street, the day after the murder, and which has been produced in court. Now, no one has seen that pistol in his possession since he bought it, but he bought such a pistol. If he had such a pistol, of course he could have accounted for it, but he is not bound to do so. The prosecution are bound to show that that is the pistol he bought. There is no other evidence in this case, touching such a pistol, except the testimony of Mrs. Walton, that she saw a pistol like that in Mr. Walton's house, somewhere, before the separation; so that there seems to have been in that family two pistols answering to that description. Of course no living witness can say that this pistol now here, is either the pistol that Mr. Walton had or the pistol which Jefferds bought. The most that can be said is, that they are precisely alike; and, as a single fact, it would, like almost any other single fact, amount to nothing; it may, or it may not form a necessary link in the chain of facts to establish a conviction. It may be of more or less consequence, according to your view of it. That the pistol found in the yard was the pistol with which the two men were shot, I suppose nobody will doubt; and that this is the pistol which was found in the yard, everybody admits. Whether it is the same pistol that Jefferds had, is a question for you to determine. Now, Mrs. Walton is necessarily more or less involved in this affair. There is only one single fact in connection with these circumstances which, in any way that

I can see, bears upon the question, so far as she is concerned, beyond the question of motive; and that is, that on the night of the murder, early in the evening, she was at Mr. Moss's, opposite the place where the murder was committed.

*Mr. Brady:* She was in Twenty-fifth street.

*Mr. Waterbury:* In Twenty-fifth street, opposite to where Walton lived.

*Recorder:* Yes, I should have so said. Then, on the other hand, gentlemen, there is the question of clothing, and the inability of the prisoner to have made the race that night, to which I have already alluded, and which has been fully discussed. Then again, the appearance which he is said to have borne on arriving in Brooklyn — his not being flushed, nor indicating any state of excitement. These facts are to be arrayed on the other side, in considering the question whether the facts against the prisoner make a perfect chain of testimony. Now, whether a man could have made the race to the Fourth avenue, jumped on a car, ridden twenty minutes to the Astor House, then gone on a hasty pace to the ferry, waited ten or twelve minutes for the boat, as he may have waited, then have crossed the river and gone to the house, and arrived in a calm, unagitated manner, so as not to be noticed, is a question for you to determine. Mrs. Costigan, who opened the door, says she did not particularly notice the prisoner's appearance ; that she had no light. I do not consider the matter of much importance, but you will give to it the weight which you think it deserves.

We now come to the day after the murder, in the continuation of the chain of facts which the prosecution claims to have made out against the prisoner. We find that the prisoner on that day came down from his room between 9 and 10 in the morning. He took no breakfast, but read the papers, those which were in the house — *The Sunday Herald,* and one of the other Sunday papers. So far as the witnesses know, he staid about the house till the table was set for dinner. They asked him to dine, but he did not want to dine, though he sat down. He did not eat much of anything. They think he

Jefferds *v.* The People.

went to his room. He came down, and the proprietor, being about to make an excursion to East New York, said, " I see you are a stranger — I am going out to East New York with some friends, won't you go along ? " He asked him his name, that he might introduce him. Jefferds said it was " Charles Jackson." They went on their pleasure party. You know what took place. I do not attach much importance to the conversation, though the subject for discussion was, to some extent, murder. Jefferds asked the question, " if a man should injure your mother or sister, what would they do with you if you shot him ? " The witness did not attach much importance to that. He (the prisoner) repeated the question, and finally said, " they would hang you like a dog." He returned to the hotel, not separating from the party. The next day he met Mr. Betts, called him aside, and told him that he had been accused of this murder, or implicated in it in some way, and wanted to know his opinion about giving himself up. Mr. Betts advised him to do so. After a while he took that course, and surrendered himself. He told Mr. Betts the reason he gave the name of Jackson on Sunday was that he saw that he was implicated in that murder in the papers, and he did not want to be dragged through the streets. Well, gentlemen, it is conceded that in the only article in any of the Sunday papers which alluded to that murder, the name of Charles Jefferds was not mentioned. All that was said on that point was that it was a family quarrel, that the parties accidentally met, and that the shooting took place. Now, if there was a family quarrel, Jefferds knew of that quarrel, and that he might be singled out as a person engaged in the quarrel and as one who had probably committed the murder, and he might possibly be arrested; and not having arrived at a conclusion which would lead him to surrender himself, it would seem very reasonable that he should endeavor to evade observation. But if his name was not mentioned in the papers in any way, nor the name of any other person connected with the murder, then the question for you to determine will be, what reason could he have had in giving to a stranger a false name instead

of his real name? This is a matter upon which the prosecution have greatly relied. If it had not been discussed fully upon the other side, I should perhaps feel bound to consider the different theories in regard to it. Certainly, the counsel for the prisoner has presented his view of the matter so ably and so fully, that it would be an idle consumption of time to reproduce his theory. I state to you the naked fact, in regard to which you have heard the argument on each side.

Now, gentlemen, I have rapidly gathered together the different facts which made up this chain, and I have stated them to you as briefly as I can from my notes. I do not think that I have omitted any important part of the chain, or that I have added one single particle to any link. If the case rested here, then the question for you to determine would be, under the rules I laid down to you in the outset of my charge, whether this chain of circumstances established to your minds, beyond any reasonable doubt, the guilt of the prisoner — whether it was such as to exclude every other hypothesis than that of the guilt of the accused. If you thought it did, then it would be your duty to find a verdict of guilty. But there is other evidence in the case, which now becomes material, independent of the question, whether you find the chain complete, or whether you find that the facts and circumstances simply indicate a probability that the prisoner committed the murder. If you find the chain complete, so that you are satisfied to render a verdict of guilty, then it would be idle for you or me to consider the case further; but if you find cause for reasonable doubt, then you come to the consideration of the confessions and admissions. The probability of the truth of these must depend, to a very great extent, upon the view you take of the other facts in the case. If it were proved to your entire satisfaction that Charles Jefferds, on the night of that murder, was in Albany, and a dozen witnesses, of unimpeached and unimpeachable character, should come into court and testify that he had said to them, openly and frankly and seriously, that he had killed John W. Matthews, you would say that the confession was not true, because

it was proved that Jefferds was in Albany at the time. I merely give that as an illustration, to show how, when you come to consider the confessions, their value is to be estimated; You will attach more or less weight to them, according to the possibility or probability of guilt, and upon that the weight of these admissions as evidence will, to some extent, depend. I have been asked to say to you substantially, that confessions, made by a man when drunk, are not entitled to be received. That, in my opinion, is not good law. I have never, in all my reading, found a case which would countenance the doctrine that a confession, made when a man was drunk, was not entitled to be received in evidence. A case has been cited to me, and your attention was called to it, in which the prisoner told the officer who had him in custody, that if he would get him two glasses of gin he would confess. The court held that that confession, made after the gin had been taken, was inadmissible. That has been decided, and is the strongest case that can be brought; but the ruling in that case has since been doubted by very able and learned judges. I am not aware of any other case, and that case is of no authority in this, because, in that the confession was made to the officer who had the man in custody.

You will perceive the distinction which exists upon this subject of confessions or admissions. Any confession or admission which is obtained by threat, menace, hope of reward, promise of favor, or anything else which can influence the mind of the accused, held out to him by a person in authority, or by the prosecutor himself, will render the confession inadmissible as evidence, because the law will not permit its officers, having men in custody, to extract confessions from them, either by threats or by promises. Nor will the law permit a prosecutor, holding some degree of power over the accused (and possibly supposed by him to have authority to discharge him), either by threat or menace, hope of reward or fear of punishment, to extract a confession and use it in evidence. So, in some other cases, in which persons, holding and exercising authority over parties, obtain confessions, such

confessions cannot be given in evidence; as, for instance, where a person has authority over a child, the confession is rejected; but where a man voluntarily, whether sober or drunk, makes a confession or admission to a person who is a stranger to the prosecution, who has no interest as prosecutor or public officer, then that confession is entitled to be received in evidence; and the only question for the jury is, as to the weight to be given to it; and that is more or less affected by the state of mind of the party making it, and the probability of the truth of the confession. I do not propose, gentlemen, to go over those confessions in detail. You know how they were obtained. As to the question whether public prosecutors or the chief officers of the police should obtain the confession of criminals through the instrumentality of detectives or spies; whether they should send men to get their confidence, and then obtain their admissions, that is purely a question of morals, with which neither you nor I, sitting here to determine the guilt or innocence of this prisoner, have anything to do. Some men think that no means necessary to detect and punish a criminal are dishonorable, no matter what they are; others think that criminals should be handled with gloves; that they should only be pursued by the most honorable, open and upright means. Others think that any means whatever, which result in the detection, conviction and punishment of the guilty, are justifiable. Probably in that jury box there are men who entertain each one of those different views. It is of no possible consequence which view I entertain, nor what your views may be upon that mere question of morals. If it is proved to your satisfaction that the confession was made, then the question for you to determine is, is it true? If you believe, when a man says, "I murdered your brother," or "shot your brother," that it is true, it is of no consequence whether he was drunk or sober when he says it, or whether the statement is obtained from him by a violation of his confidence, or by an intrigue, such as that which Moore is said to have exercised in respect to the prisoner at the bar. The confessions being in evidence, the sole question for you is, are they true?

Upon the question as to whether they are true, or whether they are false, you will, of course, bear in mind the other probabilities in the case, indicating the guilt or innocence of the prisoner. Comment has been made upon the way in which these confessions are said to have been obtained, the times at which they were obtained, the condition of the prisoner when he made them. Those are all fair matters of argument before you, as affecting the question whether they are true or false, but beyond that they have nothing to do with the case. The first confession testified to by Moore, was the confession made after the sailing party, when the prisoner came near being drowned. At that time, if Moore is to be believed, the prisoner said, whether drunk or sober, while Moore was reading the paper to him, "Yes, and I shot him like a son of a bitch." Then, again, the statement in Broadway, on the way to Walton's place that night, when he attempted to show Moore how he shot Matthews, and then what took place at Walton's store, as testified to by Walton, Moore, the captain of police, McGee and Cook. Now, I do not know what your impressions are upon the evidence as to the condition of the prisoner. It strikes me as highly probable that he was intoxicated when he made the confessions, if he made them. It strikes me as highly improbable that any sober man would make such statements; nevertheless, sober or drunk, whether he made them, and whether you believe they are true, are the only questions you have to pass upon. There is no evidence, that I recollect, that the prisoner was drunk the next morning, when he had the conversation with Moore in the street, if you believe that he had that conversation, although he may have been under the influence of drink. That was the conversation when he said he would like to go and see his mother before he went up to Walton's house; and you will recollect what he said after his arrest, as detailed by Moore, if you believe it; it does not appear that he was drunk then; but these are questions of fact solely for your consideration. I shall say no more upon the subject of confessions or admissions. You have heard all that need to be said upon that subject, and this charge has

already extended further than I intended it should. The case closed with some testimony as to character. That testimony is before you. You know how it bears, whether for or against the prisoner. I shall not repeat it. I have, in everything that I have said, in charging you, avoided any comments upon the contradictions which are put upon the testimony of Mr. Moore by Mrs. Bennett, Miss Lasselle, and Mrs. Walton herself. I do not wish to draw aside the veil from either of those persons. You have heard their statements so far as they contradict Moore, and it is for you to say, in your own good judgment, whether they discredit him. If they do discredit him, so that you throw out his testimony, then of course, the confessions would only stand as sworn to by Walton, McGee, Cook and Thorne. If you think that the record of the life of either of these women is not such as to entitle her to a preference over Moore, then you will judge Moore's testimony upon its own inherent probability. I have no desire to comment upon either of these persons; the case is full enough of sad and sickening detail — of hideous moral deformities — and I abstain from further remark.

We are not here from choice at this hour on Christmas eve; our ties, associations and inclinations would draw us elsewhere; but I felt it to be my duty, before Christmas day shall break upon us, to submit this case for your final action. I suppose neither you nor I will ever again, upon the anniversary of this sacred night, close a duty so important as this in which we have been engaged during the past week. You have, on your part, a great and solemn duty yet to perform, and I desire you to retire to your room, and with all fairness, candor and impartiality, to consider the evidence in all its aspects, and give to the prisoner the benefit of every reasonable doubt. If, then, you believe him to be guilty, unhesitatingly pronounce him so; if you do not, with like firmness pronounce his acquittal.

The court overruled the motion to strike out testimony made by defendant's counsel, and the defendant's counsel excepted.

Jefferds *v.* The People.

They also excepted to the instruction given by the court to the jury, that, "where a man voluntarily, whether sober or drunk, makes a confession or admission to a person who is a stranger to the prosecution, who has no interest as prosecutor or public officer, then the confession is entitled to be received in evidence."

They also excepted to the court's instructing the jury that they might take into consideration and act upon statements made by the defendant, when drunk, to the witness Moore.

The jury, under the instructions so given, retired, and on the twenty-fourth day of December, 1861, rendered a verdict against the prisoner of guilty of murder in the first degree, and on the fourth day of January, 1862, the prisoner was arraigned before said court for sentence.

The defendant's counsel then and there objected to the court's sentencing the defendant, insisting to the court that it had no power to do so. The court overruled the objection, and the defendant's counsel excepted.

The counsel then moved an arrest of judgment, on the ground that there was no existing law under which the defendant could be legally sentenced upon the conviction. The court denied such motion, and the defendant's counsel excepted.

The court thereupon pronounced the following sentence:

*Charles M. Jefferds:* The murders of John Walton and John W. Matthews, on the night of the 30th of June, 1860, sent a thrill of horror through this whole community. The former fell by the hand of the assassin, lying in wait to execute his deadly purpose; the latter, forgetting all danger to himself, and thinking only of his duty as a citizen, gave chase to the murderer, who, to escape arrest, turned upon his pursuer, and, with unerring aim, fired the shot which caused his instant death. All this occurred in an open thoroughfare of this crowded city, in the bright moonlight of a calm and beautiful summer's night, with the lights yet gleaming from the windows of the surrounding houses, and under circumstances which, it would seem, would have rendered the immediate detection of

the murderer almost certain. From that time, however, until this last Christmas eve, the question, as to who was the actor in this terrible tragedy, has been undecided; and then it was answered by the verdict of that jury, which pronounced you guilty of the murder of John W. Matthews. That verdict has, I believe, met the approval of almost every man who heard or carefully read the evidence upon which it was founded. You were first tried for the murder of John Walton. The evidence on that trial, in July last, pointed strongly toward you as the guilty man, but was not sufficient to warrant your conviction, and you were acquitted. Once again set at liberty, you gave way to the habits of idleness and dissipation which had marked your previous course, and in your folly, consequent thereon, you made revelations to the "detective" who was put upon your track, which sealed your fate forever. Aside from the direct admission you made to him when alone, and in the presence of others, you said enough to enable the officers of justice to ascertain where you purchased the pistol with which, it is believed, the murderous deed was done. The facts which were known before, in connection with those thus discovered, secured your conviction when you were brought to trial upon the charge of having murdered John W. Matthews.

The details of the trial I shall not recapitulate. It is not necessary to do so, and I gladly refrain. They present a picture of immorality and crime, too painful to contemplate. Your mother, whom you had charged with being the instigator of your crime, came upon the witness stand, and, while testifying on your behalf, was compelled to, and did lay bare the secret history of her life. It failed to be of any service to you. Your counsel, with a zeal, fidelity and ability which could not be surpassed, exhausted all honorable means to insure your acquittal, but in vain. No human efforts could overcome the terrible array of facts and circumstances which were brought to bear against you. And now you, yet under 25 years of age, stand here a convicted murderer, and, so far as I have been able to observe, have, as yet, exhibited no sor-

row for your crimes. Your sentence, which will be imprisonment and death, will, I hope, cause you to realize your awful situation. You cannot escape punishment, and in your felon cell, in the long weary nights yet to come, you will, if you have not already done so, think with horror upon the crime you have committed, and realize with bitter remorse the fearful judgment you have brought upon yourself. That you may, ere you die, repent and seek forgiveness of Him who is ready and willing to forgive, is the sincere prayer of the judge who presided at your trial, and who now, in the discharge of his solemn duty, pronounces sentence upon you according to law.

The sentence of the court is, that you, Charles M. Jefferds, for the murder and felony of which you have been convicted, shall, on Friday, the 20th day of February, 1863, between the hours of ten in the morning and two in the afternoon, suffer the punishment of death; and that you shall be confined at hard labor in the State prison, until such punishment of death shall be inflicted.

The prisoner was thereupon delivered into the custody of the sheriff, with a warrant for his execution.

The defendant's counsel excepted, also, to the sentence.

The case was removed into this court by writ of error.

*James T. Brady* and *Robert D. Holmes*, for the prisoner.

I. All the errors of the court below, whether the subjects of specific exception or not, are before this court, and can be reviewed. (*Sess. Laws* 1855, *p.* 613, § 3.)

This just license of the law is to be especially kept in view when the desultory character of some of the evidence and the recorder's charge to the jury shall come to be considered.

II. The court below erred in admitting evidence as to the alleged threats made by the accused against John Walton two years previously to the death of said Walton. Also, in admitting that of Corsa, Quackenbush and Gunn.

Friendly feelings were subsequently established between the deceased, Walton, and the prisoner, the latter of whom was

sent to Europe by the former. That friendly feelings existed, is shown by the letter of W. T. Walton. The presumptions of law were that the unfriendly feeling had ceased, and in the exercise of a legal discretion the evidence should have been excluded. Yet the court below in its charge laid great stress on this evidence, and pointed out to the jury the mode in which they might reason upon it as a matter of fact, entirely disconnected from any question of law. The same may be said as to the testimony of Gunn.

The law, in a criminal case especially, makes the facts the undivided property of the jury, and the court has no right to offer an opinion as to their weight or the lack of it. The law directs that *twelve* minds — no more, no less — shall weigh the facts and decide upon them; no provision is made for a thirteenth mind to aid them. The law does not suppose that a judicial or legal mind can deal more justly or understandingly with facts than one unlearned in the law.

In the present instance, the recorder distinctly pointed out to the jury a course by which they could reason on those remote facts, and the results to which their minds might be brought; such reasoning having been adverse to the prisoner, and may have been one of the causes which led to his conviction.

III. The court below erred in admitting and in not striking out of the case the testimony of William T. Walton and William B. Moore, so far as the same related to the confessions or declarations of the prisoner. Those confessions were commented on at large in the charge to the jury.

Moore was a policeman, and acted directly under the instructions of the then district attorney, and now such *ad hoc*, and was paid by him with the money of the brother of the deceased Walton. Acting as an officer of the law, he made the prisoner drunk as a means of getting from him declarations or admissions which might affect his life.

In view of this the appellant contends: That the admission of those alleged confessions was a question of law and not of fact. The declaration of the court, in its charge, that confes-

sions made by a man when drunk are entitled to be received, was error.

They were not *voluntary:* they should have been, to have entitled them to have been received. They were enforced by agencies other than the voluntary action of the prisoner's mind. The true definition of the word *voluntary*, from " volo," *will*, and the condition of the prisoner's mind at the time that he made these declarations, become important considerations. Every elementary writer who treats of confessions, starts by declaring that they *must* be "*voluntary.*" Richardson defines this to be " of the will," " wishing," " *spontaneous*," " *willful.*" Tibbins, defining the word in French, and applying it to the act of a person, uses this strong expression, " *de son plein gré*," " *of his full mind or will.*"

The prisoner was shown to have been drunk, and made so by an officer — acting under the direction of the district attorney — and using money, to buy liquors and for his expenses, furnished by a brother of the deceased Walton to that district attorney.

Before the prisoner knew Moore, he was a sober man. A small quantity of liquor excited him, made him drunk.

The prisoner knew that Moore was a detective. His mother informed him and Mr. Betts of the fact, and Mrs. Walton's letter to prisoner distinctly informed him of it. The prosecution produced that letter. This was not referred to by the court below.

The prisoner knew that he was liable to be tried again.

It is not pretended that the prisoner made any detailed confession as to the bargain with his mother to kill her husband, up to the 16th November, when he was made drunk at Carlisle's and at Walton's; and these declarations, so made, the court below erred in admitting. These declarations the court erred in admitting:

1. In the prisoner's then condition, he could not make a valid contract — one that could bind him.

2. His will would be voidable.

3. He could not have been sworn in a suit at law involving the most trivial sum. (*Hartford* v. *Palmer*, 16 *Johns. R.*, 143.)

In *Lord Thorndyke's Case* (*Pritchard on Divorce, p.* 5), the wife, while in a fit of delirium, disclosed her attachment to her paramour. On the offer to prove it, it was ruled out.

Suppose that Mrs. Walton had been indicted for her alleged share in this transaction, and Jefferds, in his then condition, had been offered as a witness: he could not have been sworn or used as a witness. Yet this court is asked to sustain the monstrous doctrine that his declarations, then made, and so made, and not on oath, shall be taken at second hand by a professed spy — a creature which communities shun and nations hang — and be used as evidence against his life. (*King* v. *Sexton*, 1 *Burns's Just.*, ed. 1836, *pp.* 1086, 1087.)

The confessions of youths are excluded because of the weakness of their minds. What strength of mind has a drunken man? Should he promise to pay money, would a court say that an indebtedness was proved? Should he attempt to do any ordinary act requiring mental direction or involving the least physical danger, would he not be restrained?

Drunkenness is temporary insanity. In the former, the mind becomes disarranged and deranged in its functions. In the latter, the same effects follow, though they may be the result of different causes. Suppose, instead of drunkenness, the prisoner had labored under the effects of some narcotic drug which benumbed his mental faculties? Would the *cause*, because less immoral perhaps, make the slightest difference in his capacity, or render his declarations the more proper to be received?

All medical authorities are against the soundness of the mind of a drunken man to perform, understandingly, any intellectual labor. Daily observation proves this.

IV. The court below erred in allowing specific acts of Mrs. Walton to be inquired into for *any* purpose not relevant to the issue.

The pretense that these questions were asked to prove that the witness was not the wife of the deceased Walton, is too

flimsy to deserve an instant's consideration. The prosecution, as to these matters, made her its own witness, and proving the fact that she might or might not have sworn to have been the wife of Morrison, proved no fact except that of her having so sworn. It certainly did not prove her to have been or not have been married to him. But she distinctly swore that she was not his wife. The prosecution called this out, and they were bound by it.

Whether she was Morrison's wife or not, was totally irrelevant and collateral to the issue. Hence the prosecution sought to impeach the witness by drawing out irrelevant testimony, totally disconnected from anything called out on or by the direct examination, and subsequently seeking to contradict her and by testimony *aliunde*.

Thus, the whole effort of the prosecution — under an inexcusable subterfuge — was directed to the impeachment of the character of the witness for truth and veracity, by proof of the commission of a specific collateral act. (1 *Greenl. Ev.*, §§ 449, 461, 462; *People* v. *Restell*, 1 *Comst. R.*, 379; *People* v. *Moore*, 15 *Wend. R.*, 419; *Lawrence* v. *Barker*, 5 *Id.*, 301; *Stevens* v. *Beach*, 12 *Verm. R.*, 585; *State* v. *Patterson*, 2 *Ired. R.*, 346.)

Here, then, are two violations of the best settled questions of evidence.

1. A persistent effort to contradict a witness as to matters collateral to the issue.

2. Forcing a witness to answer questions as to which she was privileged, because the matters were collateral and might have degraded her.

In both points of view the defendant suffered.

Instead of admitting the questions to be put, it was the duty of the court to have advised the witness of her rights. Had even this been done, and she had then chosen to answer, the defendant's objection as to the relevancy of the matters should have prevented the reception of the evidence. (1 *Greenleaf's Ev.*, § 451.)

She was sought to be impeached as to a collateral matter on a written paper which was not produced, and when, confess-

edly, its contents could not be given by parole, and only its substance by mere generalities. This was done without proper search.

There is no provision in the law for the impeachment of a witness on a lost paper. It is not susceptible of being made by parol the basis of impeachment, even if relevant to the issue. The authorities are all and strongly against it. (*Saint-hill* v. *Bound,* 4 *Esp. R.,* 74; 1 *Greenleaf's Evidence,* § 463; *Queen's Case,* 2 *B. and Bingham R.,* 293; *McDonnell* v. *Evans,* 16 *Jurist R.,* 103; *Newcomb Adm.* v. *Griswold, decided June Term, Court Appeals.*)

The admission of the deed in evidence was error. That deed was collateral to the issues under the indictment. The rules of law above cited apply to this branch of the case.

It could not be made to impeach the testimony of Mrs. Walton, because she herself proved it, and in proving it showed the circumstances under which it was given. The grantees would not take a deed unless she signed it jointly with Morrison. The witness was the only person who testified as to that deed, and her statements must have been taken together. The deed did not prove a marriage with Morrison, but simply that she lived with him as his wife. Therefore the sole tendency and intention of this evidence was to degrade her.

The court, in considering the features embraced in the point, will bear in mind the vital importance to the accused of Mrs. Walton's evidence, who was the only witness who could contradict the alleged facts in the testimony of W. B. Moore as to the bargain of the prisoner with his mother to kill her husband.

V. The court below gravely erred in its charge to the jury. The rule there stated, so broad and sweeping, is violative of the authorities cited above. The court, in its charge, has taken three incompatible positions; the first of which is repugnant to the last two, and the last two being direct invasions of the property of the jury in the facts and their weight.

1st. His honor stated that he would not review the facts.

2d. That he had individually formed an opinion, and could

Jefferds v. The People.

not help it; but that he had no right to indicate it even.   He subsequently gave that opinion broad and emphatic expression.

3d.  He distinctly announces that opinion.   He then admits the great importance of the very evidence which he said was unimportant.

Again, he expresses an opinion on one of the most material features of the defense, and distinctly states that he does not consider it a matter of much importance.

The court again erred in charging that a *drunken* man could make, in view of law, a voluntary confession.

VI.  The judgment should be arrested, there being no authority under existing laws to pronounce any sentence on the accused.

*Nelson J. Waterbury* (District Attorney), for the People.

*By the court,* INGRAHAM, P. J.   The prisoner was convicted of murder in the first degree, in killing John W. Matthews.

The offense was committed in June, 1860.   The cause was tried in December, 1861, and the prisoner was sentenced, on the 4th January, 1862, to suffer the punishment of death on the 20th February, 1863, and to be confined at hard labor in the State prison until such punishment of death shall be inflicted.

The case comes before us on a writ of error and bill of exceptions.

Upon the trial, the court admitted evidence of threats made by the prisoner two years prior to the murder.   To this the prisoner's counsel objected.   At the time this evidence was offered, no proof had been given of any friendly feeling existing between the prisoner and Matthews.   It was admissible to show that for a period even as long as two years the prisoner had threatened the life of the deceased.   It is no objection to such evidence that a period of years had expired since the threats were made.   On the contrary, long continued animosity and ill will are better evidence of a state of mind which would ripen into deliberate murder than the hasty ebullition of passion.   The theory of the law as to murder is that it is

made on premeditation, and the motives for such an act are not the less powerful because they are the result of ill feelings entertained for years.

It was, however, urged upon the argument that it was improperly admitted because it was afterwards shown that friendly feelings existed between the parties. This evidence was put in afterwards. It was proper to be submitted to the jury, and from it to urge reasons why the threats before proven should lose their weight with the jury; but this evidence furnished no reason why the previous evidence was improper when admitted.

It is also urged that his honor the recorder, in his charge to the jury, referred to this evidence as furnishing motive for the crime.

I see nothing in the recorder's charge which is objectionable in this respect. It is true that he referred to these threats as evincing a state of feeling of hostility. At the same time he told them, if those threats had been made over two years previously, they would be entitled to little weight with the jury. It was only in subsequent disagreements between the parties they assumed more force and effect.

The instructions on this point were not erroneous, and contained sufficient caution to prevent the jury from giving more weight to them than was proper.

William J. Walton and William B. Moore, were examined by the prosecution, to prove admissions made by the prisoner, in regard to the killing of Walton. At the time these admissions were proven, no objections were made to them on behalf of the prisoner. Subsequently, the prisoner's counsel moved to have them stricken out, on the ground that they were given by the prisoner under such circumstances as not to warrant their reception.

It appeared in evidence, that these conversations were held with Moore and Walton while the prisoner was, to some extent, intoxicated. Moore, being a police officer, was employed by superintendent Kennedy and the district attorney, to follow Jefferds, with a view of obtaining this information. It

Jefferds v. The People.

does not appear that he received any instructions as to the means which he was to use to effect his purpose. The instructions he received are not stated. It also appeared in evidence, that one means used by Moore, to obtain the confidence of the prisoner, was to ingratiate himself into his friendship, and, with the aid of liquors freely supplied by the officer, the confessions were obtained.

It was for these reasons that the motion was made to strike out the testimony.

It must be remembered that the evidence from both witnesses was received without objection, and it was not till the whole examination was closed that the motion was made to strike out the testimony. It was, therefore, properly received at the time it was given. The subsequent evidence, showing that the confessions were made in a state of intoxication, was not sufficient to warrant the court to take these admissions from the jury. It was by no means clearly established that the prisoner, at the time he made the admissions given in evidence, was so much intoxicated that he was unconscious of what he said, or to warrant the supposition that what he said was untrue. The state of the prisoner, when the confessions were made, was properly before the jury. The argument which has been addressed to us, to convince the court that the evidence should have been stricken out, might, with more propriety, have been addressed to the jury to satisfy them that the confessions of the prisoner, made by him while in that condition, were not reliable, and ought not to have been used for his conviction. It was a question of fact for the jury to determine, what the condition of the prisoner was when he made the confessions, and how much reliance might be placed in them.

In *Rex* v. *Spillbury et al.* (7 *Carr. & P. R.*, 187; 32 *Eng. Com. L. R.*, 565), COLERIDGE, J., held that statements made by a prisoner to a constable, when he was drunk, were admissible. In that case, also, as in this, it appeared that the constable had given liquor to the prisoner to cause him to make such statements. The judge said this was matter of observation to

the jury, as to the degree of credit such statements were entitled to.

Similar in their nature are the remarks of SELDEN, J., in *The People* v. *McMahon* (15 *N. Y. R.*, 384, 391), referring to the case of a letter written by a prisoner to his father, which the turnkey promised to put into the post, but which he delivered to the magistrate, who used it in evidence, and, also, to the case of a confession made to one who had taken an oath not to reveal it, he says : "If the law was scrupulous about the means of arriving at the truth, would it have received such evidence? Is fraud more honorable than force? These cases show this, that the question always is, whether the evidence can be relied on, and not how it was obtained."

And in *The People* v. *Hendrickson* (8 *How. Pr. R.*, 176), SELDEN, J., says, in his dissenting opinion, "the object of the law is to ascertain truth, and it rejects no evidence, come from what source it may, which is calculated to show light upon it."

It is true that a witness, in a state of intoxication, ought not to be allowed to go on the stand as a witness, and the counsel has urged upon us to apply to these confessions the same rule. But, while I concede to that rule all the force that can be asked for it, it is not applicable to this case. I have already remarked that it belonged to the jury to say how far the prisoner was affected when he made the confessions, and to decide what weight they would give them. A more analogous case is where a witness testifies to a matter which occurred while he was in a state of intoxication. There his evidence is not excluded, but his condition may be shown to the jury for their decision, as to its effect on the truth of his statements. Nor do I think there is anything in the objection that these confessions were not voluntary, and, therefore, should have been excluded.

Laying out of view the condition of the prisoner at the time he made the confessions, it would not be urged that they were not voluntary. They were made in conversation with a supposed friend, without any promise or inducement, and rather as a boast of what the prisoner had done, and with the know-

ledge of his former trial and acquittal. Such confessions, although obtained by deception, must still be considered as voluntary on the part of the prisoner. It is for the jury to take all these attendant circumstances into consideration, when they determine the weight to be given to the confessions made in such a manner.

But, while I am of the opinion that there was no error in suffering this testimony to go to the jury, that would call for a new trial, I do not wish to be considered as in any manner assenting to the propriety of obtaining evidence in such a manner for the purpose of convicting a criminal.

An officer may be employed by the prosecution for the purpose of watching a supposed criminal, and for the purpose of detection. Crime often cannot be otherwise discovered. But when such an officer ingratiates himself as a friend to the criminal, when he procures liquor and uses it for the intoxication and ruin of the supposed culprit, when he urges upon him the constant use of intoxicating drinks, until maddened by their use, the accused, in a spirit of boasting rather than in the exercise of his reason, and in response to suggestions made by the officer, proclaims his guilt, it appears to me that the officer goes far beyond the line of his duty, and is guilty of conduct throwing no credit on such an administration of criminal justice. But, however much we may condemn this proceeding, still it was not error to admit the testimony on the trial. The learned judge before whom the case was tried, while he correctly held that the confessions were not to be kept from the jury, felt also unwilling to state to the jury his approval of the mode in which they were obtained.

It was also urged on the argument, that these confessions were the remarks of a drunken man, and that drunkenness was partial insanity, and therefore should have been excluded. I have heretofore referred to the condition of the prisoner as a matter proper for the jury to pass upon. He may have been so intoxicated as to have been unconscious of what his words meant, and he may only have been excited by liquor, but still possessed of his reason and judgment. All this was

properly submitted to the jury, and the instructions on this point were not objected to.

Upon the trial, the witness, Mrs. Walton, was asked a question about John Boardman, whereupon the counsel for the prisoner stated that they did not wish to prevent the fullest investigation, and wished to leave the witness to answer fully and freely every question, but desired the court *to consider them as excepting to each question.*

Such a general mode of exception, if sanctioned, would very much tend to shorten the argument of questions relating to the evidence. If a counsel can, on the commencement of the cause, give notice that he excepts to each question thereafter to be put to a witness, it would be unnecessary to make any further objections. Such a course cannot be sanctioned, and such an exception must be unavailing. If the court, on the trial, choose to sanction it, still it can have no effect until the exception is incorporated in the bill of exceptions to each distinct question. The proposition that a full and free examination is assented to by the counsel, while at the same time he can have an exception secretly laid up to use, if necessary, on appeal, is contrary to any rule that I have known on the trial of a cause.

These remarks apply to the questions put to the witness as to Boardman, and also whether she had made oath that she was the wife of Morrison. I do not consider that these questions can be considered as answered under exception.

Even if they were, I am of the opinion that they were not irrelevant.

It would have been irrelevant for the prosecution, in the first instance, to have asked of the witness if she had been the wife of Morrison, and then, for the purpose of impeachment, to show that on some occasion the witness had made an affidavit to the contrary.

Such was not the testimony. The witness had sworn she was the widow of Walton, in answer to a question put on behalf of the prisoner.

Whether this was so or not, was not material, unless for the

purpose of describing her relation to the deceased; but having been proved for the defense, the prosecution had a right to show that she was not in fact his widow, by facts which disclosed the legal relation she bore to him.

For this purpose the inquiry as to Morrison was proper.

The inquiry as to the affidavit was not objected to at the time. It was urged that the proper foundation had not been laid to admit the affidavit in evidence, to contradict the witness as to her statement in regard to Morrison.

That rule rather applies to the inquiry put to the witness, whether she had made such an affidavit, than to the admissibility of the affidavit itself. The paper, if in existence, should have been shown to the witness before the witness could be asked as to its existence.

In *Billenger* v. *The People* (8 *Wend. R.*, 595, 598), SUTHERLAND, J., says: The question (viz., what the witness had sworn to before the magistrate) was inadmissible on other grounds. It appeared that the examination was reduced to writing. So far, therefore, as the object of the inquiry was to show what her testimony was before the magistrate it was improper, because the examination itself was higher and better evidence, and, citing the ruling in the *Queen's Case*, that a witness could not, upon cross-examination, be asked whether, in a certain letter, he did, or did not, make certain statements, or use certain expressions, but that the letter itself must first be read before the cross-examination can be pursued, he adds, "such is believed to be the established rule and practice in this State." "This principle seems to be applicable to a case like this, and to show that the examination of the witness, taken by the magistrate, should first have been read or shown to the witness, before she could be cross-examined in relation to her testimony upon that occasion.

When the question was put to Mrs. Walton whether she had ever made oath that she was the wife of Morrison, no objection was made by the counsel calling for the production of the affidavit. It was too late afterwards to object on that ground.

But even if made, the fact of its being lost rendered its production impossible. It could not be produced for that reason, and its contents could not be stated to the witness, because they were not known with certainty to the party making the inquiry. In *The People* v. *Moore* (15 *Wend. R.*, 419–422), SAVAGE, Ch. J., says: "It is argued that the examination was not admissible until after the attention of the justice had been called to the supposed discrepancies between his parol account of the testimony of Crofoot and the testimony, as stated, in writing, in the examination, in answer to which it will be observed that it was impossible to draw the attention of the justice to the supposed discrepancy, as the paper was not in evidence, nor in the possession of the defendant's counsel, who could not, therefore, know with certainty what it contained."

So, in this case, the production of the paper was excused by its loss. The time and place, and subject matter of the affidavit, was stated to the witness, sufficient to call it to her recollection. This was all that could be done if the paper was lost, and was all that was required to warrant proof of its contents.

The evidence of the deed executed by Morrison and Mrs. Walton, as his wife, was admissible for the purpose stated by the court, if I am correct, in the preceding remarks, as to the admission of evidence to show that she had sworn she was the wife of Morrison.

The same rule will apply to this evidence as to that, viz., that it is admissible as contradicting the testimony of the witness, given by the defense, that she was the widow of Walton.

The other exceptions are to the charge of the recorder.

I see nothing in the comments on the facts which shows any error. How far it is advisable for a judge to refer to the facts of a case, must depend entirely on his judgment and discretion. It is not error to comment upon them, or even to give the theory of the judge in regard to such facts as are proven. If, after all, the decision of the facts is left to the jury, it affords

Jefferds v. The People.

no ground of exception that the judge has reviewed the evidence on any branch of the case. This was done by the recorder throughout his charge.

Nor do I consider the charge obnoxious to the construction, put upon it by the defendant's counsel, that a drunken man could, in view of the law, make a voluntary confession. His remark was, where a man voluntarily, whether sober or drunk, makes a confession, &c., such confession is to be received in evidence. There is no error in that remark, more especially with the qualification that it was the province of the jury to decide what weight was to be given to it.

The charge that, whether this offense was murder in the first degree depended upon whether the jury should find that the killing was willful, deliberate and premeditated, was only in accordance with the words of the act of 1860. Whether it was so or not, was left to the jury, and also what degree of murder, if any, was for them to decide.

Upon all the exceptions thus raised, I find no error calling for a new trial; and am of the opinion that the verdict should not be disturbed, therefore.

This cause having been tried in the Sessions, the rules applicable to exceptions by the statute of 1855 are very much relaxed, and the court may order a new trial if it shall be satisfied that the verdict was against law or against the weight of evidence, or that justice requires a new trial.

If the evidence was properly admitted, there can be no ground for a new trial in this case. I have already referred to all the grounds of objection suggested to us by the counsel for the prisoner. Nor do I feel warranted in saying that there is anything in the case which would bring it within the provision of the statute that justice requires a new trial. No error has been committed; and the case having been fairly submitted to the jury, and their verdict having been rendered without any appearance of prejudice or partiality, there is nothing which calls for the exercise by this court of the powers conferred by that statute.

The remaining question is that which arises as to the effect

of the act of 1860 in altering the law of murder. By a stipu-
lation between the counsel, the argument in this case was to be
made in the case of Lowenberg at the same term. In that case
the court have decided to affirm the judgment. I have ex-
pressed my dissent in that case; but the conclusion of the
court being adverse to the prisoner, the judgment must be
affirmed.

---

SUPREME COURT. Broome General Term, May, 1864. *Camp-
bell, Parker, Mason* and *Balcom,* Justices.